213 F.Supp.2d 1035 (2002)
AMERICAN RIVER TRANSPORTATION COMPANY, INC., Plaintiff,
v.
PARAGON MARINE SERVICES, INC, et al., Defendants.
No. 4:99-CV-1444 CAS.
United States District Court, E.D. Missouri, Eastern Division.
April 30, 2002.
*1036 *1037 *1038 Simon Tonkin, James O. Hacking, III, Tonkin & Mondl, St. Louis, MO, for plaintiff.
Brett W. Batty, Charles James Law Office, Wetnzville, MO. Thomas M. Buckley, III, Gerard T. Noce, Hilary R. Huffman, Noce & Buckley, St. Louis, MO, George M. Velcich, John A. O'Donnell, Steven B. Belgrade, Patrick J. Cullinan, Bellgrade & O'Donnell, PC, Chicago, IL, for Paragon Marine Services, Inc. and Consolidated Grain and Barge Company.
*1039 Thoedore H. Lucas, James V. O'Brien, Lewis & Rice, St. Louis, MO, for Lewis & Clark Marine, Inc.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
SHAW, District Judge.
This matter came before the Court for trial on July 24, 2001. This maritime case involves a barge breakaway which occurred on the Mississippi River near St. Louis, Missouri. Plaintiff American River Transportation Company, Inc. ("ARTCO") brings the present action against defendants Paragon Marine Services, Inc. ("Paragon") and consolidated Grain and Barge Co. ("CGB"), seeking $1,544,713.00 for barge repairs, cargo loss, salvage costs, shifting and surveying costs and related expenses; and pre-judgement interest, compounded annually, at 8.52 percent per annum on $1,544,713.00, from April 24, 1998 to the date of judgment. The Court having heard the evidence and statements of counsel, and having carefully reviewed the parties' post-trial briefs and proposed findings of fact and conclusions of law, now finds and concludes as follows:

FINDINGS OF FACT
1. ARTCO operates barge fleets along the upper Mississippi River in the St. Louis Harbor, where the river barges are moored (Vol. II  p. 3, l. 15-19).[1] These fleets include fleets at the foot of Lesperance Street and Barton Street, as well as two fleets at Plaintiff's Reidy Terminal, which are referred to as Upper and Lower Reidy fleets. (Vol. II  p. 3, l. 24 to p. 4, l. 1).
2. ARTCO's Lesperance Street fleet is located at Mile Marker 177.9 on the Missouri bank (Vol. II  p. 10, l. 21-25). This fleet is used to moor loaded barges (Vol. II  p. 11, l. 1-4). On the evening of April 24, 1998, the Lesperance Street fleet consisted of two strings of fleet barges, as well as forty-four additional barges, tied off in nine strings of various lengths (Plaintiff's Exhibit 108). One barge, the ART 381, was located at the head of the Lesperance Street fleet, four barge widths to the outside of the main tie off (Id.).
3. ARTCO's Barton Street fleet is located at Mile Marker 177.6 on the Missouri bank (Vol. II  p. 11, l. 5-9). Prior to the breakaway, the Barton Street fleet consisted of two fleet barges, as well as twenty-four additional barges, with nine barges across the head of that fleet (Plaintiff's Exhibit 109).
4. ARTCO's Upper Reidy fleet is located at Mile Marker 175.1 on the Missouri bank (Vol. II  p. 11, l. 12-16). This fleet is approximately two and a half miles down river from the Barton Street fleet (Vol. II  p. 11, l. 21-24). Prior to the breakaway, the Upper Reidy fleet consisted of five fleet barges, as well as thirty-six additional *1040 barges, tied off in eight strings of various lengths (Plaintiff's Exhibit 110).
5. ARTCO's Lower Reidy fleet is located at 174.9 on the Missouri bank, immediately below ARTCO's Upper Reidy fleet (Vol. II  p. 12, l. 3-4). Prior to the breakaway, the Lower Reidy fleet consisted of one string of four fleet barges, as well as forty-six additional barges, tied off in ten strings of various lengths (Plaintiff's Exhibit 108).
6. In April of 1998, Defendants Paragon and CGB operated a total of nine barge fleeting areas along the upper Mississippi River near St. Louis (Vol. II  p. 3, l. 20-23), including the Valley Main fleet (Vol. II  p. 3, l. 21). At these fleets Defendants moored customer barges for a fee (Vol. IV  p. 7, l. 2-19). Defendants' Valley Main fleet is located on the Missouri bank of the Mississippi River, approximately 1,500 feet upriver from ARTCO's Lesperance Street fleet (Plaintiff's Exhibit 104A, 105). The current flows "south from the Paragon fleet directly into the head of the Lesperance [sic] fleet ... (Vol. VB  p. 13, l. 8-10)." Between the Valley Main and Lesperance Street fleets, the current flows straight down river, with a slight set towards the Missouri bank (Vol. IIIA  p. 77, l. 2-14).
7. CGB and Paragon are interconnected companies. In April of 1998, CGB owned twenty-five percent of Paragon stock (Vol. VIB  p. 9, l. 20-23; Plaintiff's Exhibit 114, p. 38, l. 16-20). Mr. DeVan Janssen, Vice-President of CGB, served simultaneously as a member of the board of directors of Paragon (Vol. VIB  p. 9, l. 24 to p. 10, l. 6; Plaintiff's Exhibit 114, p. 39, l. 2-13).
8. In addition, Paragon and CGB had a written fleeting agreement which governed the operation of Defendants' fleets in the St. Louis Harbor, including the Valley Main fleet (Plaintiff's Exhibit 114, p. 33, l. 13-23). According to the terms of the agreement, Paragon agreed to consult with CGB concerning the number, identity and qualifications of persons Paragon assigned to the fleets (Plaintiff's Exhibit 114, p. 37, l. 22 to p. 38, l. 6). CGB had the right, under the terms of the agreement, to approve or deny any addition or improvement to equipment which cost more than $5,000 (Plaintiff's Exhibit 114, p. 50, l. 7 to p. 51, l. 2). CGB bore sole financial responsibility for the operation of the Paragon fleets, and reimbursed Paragon for all maintenance and expenses incurred (Plaintiff's Exhibit 114, p. 42, l. 22 to p. 43, l. 13).
9. Prior to the breakaway, barge ING 5565 was moored upstream of every other barge involved in the breakaway (Vol. IV-B  p. 31, l. 6-9).
10. The ING 5565 is a steel barge with dimensions of 195 feet long by 35 feet wide by 12 feet deep and was loaded with fertilizer (Vol. II  p. 4, l. 22-24).[2] The loaded barge weighed 1,700, tons or 3,400,000 pounds (Vol. V-A, p. 30). The ING 5565 has one rake (or sloped) end and one box (or square) end. The box end corners of the barge have a smaller radius than the rake end corners, and the box end sits lower in the water than the rake end (Vol. VI-B, p. 42, l. 21 to p. 43, l. 1).
11. On April 23, 1998, the Motor Vessel R. CLAYTON McWHORTER delivered barge ING 5565 to Defendants at approximately 10:15 a.m. (Vol. II, p. 4, l. 20-22; Vol. IV-A, p. 15, l. 10-15; Plaintiff's Exhibit 6).
12. Defendants' tug, the M/V FRANCIS, took control of the ING 5565 (along *1041 with several other barges) and placed that barge into the Valley Main fleet (Vol. II, p. 4, l. 25 to p. 5, l. 2).
13. The crew of the FRANCIS tied off the barge at the head of the fleet on the "outside" string, which is the string closest to the middle of the channel and furthest from the river bank (Vol. II, p. 5, l. 2-4; Vol. IV-A, p. 15, l. 18-21). The ING 5565 was moored with the rake (bow) end upstream and the box (stern) end downstream (Vol. VI-B, p. 42, l. 15-20).
14. The ING 5565 remained in Defendant's Valley Main fleet through April 23, 1998 and into April 24, 1998.
15. James Patterson, the President of Paragon, testified that Paragon charged a fee to Ingram Barge Line, the owner of the ING 5565, for fleeting that barge in the Valley Main fleet in April of 1998 (Vol. VI-B, p. 23, l. 3-6).
16. Mr. Patterson stated barge ING 5565 was in the exclusive custody and control of Paragon at the time of the breakaway (Vol. VI-B, p. 23, l. 7-9). He admitted that Paragon bore full responsibility for the ING 5565 while the barge was in its custody. (Vol. VI-B, p. 23, l. 7-12).
17. The operations manager for Paragon, Mr. Karl Berthelot, testified that when a barge such as the ING 5565 is delivered to Paragon, it is the responsibility of Paragon to fleet the barge safely (Vol. IV-A, p. 7, l. 12-19).
18. The river stage in the St. Louis harbor on the morning of April 24, 1998, at 7 a.m. was 28.4 feet (Vol. II, p. 5, l. 5-8; Plaintiff's Exhibit 82); the next morning, the river stage was 27.6 feet (Id.). Flood stage on the St. Louis gauge is 30 feet (Vol. II, p. 5, l. 8-10; Plaintiffs Exhibit 104A).
19. Numerous witnesses testified that the current was swift on the night of the breakaway, including: Paragon deckhand Robert Floyd (Vol. IV-A, p. 55, l. 19-22); ARTCO mates Tony Impennachio (Vol. II, p. 31, l. 25 to p. 32, l. 2) and Jason Powers (Vol. II, p. 79, l. 5-7); Dwayne Vandygriff, the pilot of a harbor tug operated by Lewis & Clark Marine ("Lewis & Clark") known as the M/V MISS JULES (Vol. II, p. 92, l. 10-11); and, a mate aboard the MISS JULES, William Housley (Vol. IV-A, p. 55, l. 19-22).
20. Jeff Terrell, the pilot of the M/V JOHN H. MACMILLAN estimated the current speed was 7 to 8 miles per hour (Vol. III-A, p. 17, l. 20). Engineer Paul Weiss estimated the current speed in the stretch of river involved at 5  10 miles per hour (Vol. V-A, p. 27, l. 16  p. 28, l. 9).
21. At 6 p.m. on April 24, 1998, five barges were tied off in the Valley Main fleet, with two strings consisting of two barges each, with the ING 5565 moored on the outside of the two strings at the upstream end (Vol. IV-A, p. 43, l. 12-24; Vol. II, p. 4, l. 15-19). Plaintiff's Exhibit 106 is a diagram that depicts the configuration of the barges in the Valley Main fleet at this time.
22. The M/V FRANCIS and the M/V JOHN WALKER, Paragon tugs, shifted the inside string of two barges out of the Valley Main fleet at approximately 6:45 p.m.(Vol. IV-A, p. 47, l. 20-23; Plaintiff's Exhibit 14 and 15).[3] To perform this maneuver, the FRANCIS faced up to the downstream end of barge ING 442 (Vol. IV-A, p. 44, l. 16-22). The JOHN WALKER *1042 faced up to barge DPT 101 and shifted the outside three barges, including the ING 5565, out into the river, to allow the FRANCIS to remove the inside string (Vol. IV-A, p. 45, l. 6-24). Plaintiff's Exhibit 106 shows the position of the two tugs and the barges in the Valley Main fleet when the barge shifting began. The JOHN WALKER pulled the three outside barges approximately seventy feet out into the channel (Vol. IV-A, p. 46, l. 10-16). After the FRANCIS removed the inside string, the JOHN WALKER maneuvered the three barges it was holding back into the Valley Main fleet, landing them against the fleet barges (Vol. IV-A, p. 47, l. 6-12).
23. When the shifting procedure had been completed, the barges were configured in the following manner, which is depicted in a diagram that is Plaintiff's Exhibit 107. The ING 5565 was at the upstream end of the Valley Main fleet and was the outside barge in that fleet (Vol. IV-A, p. 12, l. 9-22; Plaintiff's Exhibit 107). The ING 5565 was five barge-widths, or about 140 feet, from the river bank and was tied off on its port side to the starboard side of another Ingram barge, the ING 5561. The ING 5565 was moored with its rake end upstream and bow end downstream. The ING 5565 was moored only to the ING 5561, as there were no barges on its bow end, stern end, or starboard side.
24. Paragon crewmembers never inspected the tie-offs between the ING 5565 and the ING 5561, after those barges were shifted out into the river and back into the fleet, to determine if the tie-offs were secure (Vol. VI-A, p. 38, l. 16-25). Crewmembers of the Paragon crew testified they checked the tie-offs between those two barges before the shift, but not after the shift (Vol. VI-A, p. 38, l. 16  p. 39, l. 2).
25. At about 7:30 p.m. on the evening of the breakaway, the crew of an ARTCO tug, the M/V BILL PEHLER, went to Plaintiff's Lesperance Street fleet to inspect the tie offs in that fleet and to place lights on the outside corners of the fleet (Vol. II, p. 81, l. 12-13).[4]
26. Mate Jason Powers and deckhand Maury Gardner walked across the head of the Lesperance Street fleet and inspected the wires to insure that each wire was tight and properly secured (Vol. II, p. 81, l. 14-16). Mr. Powers testified that the barges at the head of that fleet were properly tied off with 1" diameter steel wires, that were tightened by winches (Vol. II, p. 81, l. 1-11). Plaintiff's Exhibit 87F depicts the manner in which the barges in the Lesperance Street fleet were secured that evening (Vol. II, p. 81, l. 5-11).
27. Prior to the breakaway, the Lesperance Street fleet held forty-two loaded barges and three empty barges. The barges were secured in a manner that complied with all applicable governmental regulations (Vol. IV-B, p. 11, l. 22 to p. 12, l. 8; Plaintiff's Exhibit # 108). The ARTCO fleets were their usual width on the night of the breakaway (Vol. IV-B, p. 11, l. 6-10).
28. Barge ART 381 was located at the head of the Lesperance Street fleet, five barges in from the riverward side of the fleet. Plaintiff's Exhibit # 108 is a diagram of barges in the Lesperance street fleet, including the ART 381. The ART 381 was loaded and moored with its rake end facing upstream, toward the Valley Main fleet where the ING 5565 was moored (Vol. IV-B, p. 3, l. 18-22).
29. At approximately 9:30 p.m., about three hours after the Paragon tugs shifted the ING 5565 and other barges in the *1043 Valley Main fleet, the ING 5565 barge came free from its moorings and drifted down river, unattended, in a swift current (Vol. IV-A, p. 16, l. 3-7).
30. As discussed more fully below, the runaway ING 5565 barge struck ARTCO's Lesperance Street fleet, causing the steel wires securing barges in that fleet to break. The ING 5565 impacted the ART 381 at approximately the center of the headlog at its bow end (Vol. V-A, p. 40, l. 12-18). The damage sustained by the ART 381 is depicted in photographs that are Plaintiff's Exhibits 87A, 87B, 95B4 and 95C3.
31. The rigging between the ART 381 and the PCBL 176, an adjacent barge in the Lesperance Street fleet, broke (Vol. V-A, p. 40, l. 12-20), as did other wires between the fourth and fifth strings of barges at Lesperance Street fleet (Vol. V-A, p. 41, l. 1-8). Numerous photos, including Plaintiff's Exhibits 95G3, 95E4, 95O3, 95E3, 95D3, 95J3, 97C, 97E, 97F, 97G, 97H, 97I, 97J, 97K, 97L, 97M, 102E, 102F and 102G, depict the broken wires from the Lesperance Street fleet as they existed after the breakaway.
32. The five outside strings of barges broke free and came out of the Lesperance Street fleet (Vol. IV-B, p. 3, l. 18-22). These 25 barges are depicted in light green on Plaintiff's Exhibit 108. The barges, all of which were loaded with cargo, drifted downriver and struck the Barton Street fleet, knocking additional barges out of that fleet, as depicted in Plaintiff's Exhibit 109 (Vol. II, p. 5, l. 18-20). The loose barges then drifted down to ARTCO's Upper Reidy and Lower Reidy fleets and knocked barges loose from those fleets (Vol. III-A, p. 48, l. 12-25).[5] A total of 102 barges that had been moored in ARTCO's fleets were knocked loose. Plaintiff's Exhibits 110 and 111 depict the barges knocked loose from the Upper Reidy and Lower Reidy fleets. In exhibits 108, 109, 110 and 111, barges knocked out a fleet are shaded green, moored barges that stayed in the fleet are white, and the fleet barges are shaded brown.
33. Post-breakaway inspections of the Lesperance Street fleet, as well as barges that came out of that fleet, confirm that fleet was struck by a runaway barge. Many freshly broken wires were present in each of the ARTCO fleets involved  including the Lesperance Street fleet (Vol. III-A, p. 50, l. 18 to p. 51, l. 18; Vol. IV-B, p. 22, l. 13-17). Numerous broken wires, including three wires used to tie off the ART 381 to the PCBL 176, were saved and several were introduced into evidence as Plaintiff's Exhibits 41, 42, 43, 44, 47 and 48. (Other broken wires saved were displayed at trial, but not entered in evidence due to their bulk.)
34. Capt. Jeff Terrell, the pilot of the M/V JOHN H. MACMILLAN, observed broken wires on many of the barges he gathered during the breakaway aftermath (Vol. III-A, p. 78, l. 22-24). Another ARTCO employee, Mark Hatcher inspected the Upper and Lower Reidy fleets, the Barton Street fleet and the Lesperance Street fleet immediately after the breakaway and also observed numerous broken wires (Vol. III-A, p. 50, l. 18 to p. 51, l. 18).
35. Inspection of the broken wires revealed the breaks were fresh and consistent with overstressing from the impact of a runaway barge (Vol. IV-B, p. 45, l. 23 to p. 46, l. 1). The broken wires were frayed and had shiny steel ends (Vol. IV-B, p. 45, l. 23 to p. 46, l. 1; Plaintiff's Exhibits 95G3, 95E4, 95O3, 95E3, 95D3, 95J3, 97C, 97E, *1044 97F, 97G, 97H, 97I, 97J, 97K, 97L, 97M, 102E, 102F and 102G). Mate Tony Impennachio explained, "[a] wire that has been cut will have a straight usually unfrayed edge. A wire that's been popped or broken, the end of the wire frays out" (Vol. II, p. 46, l. 13-15). Shiny ends of a broken wire indicate the break is recent, as the ends have not begun to rust or oxidize.
36. A marine surveyor hired by Defendants, James Pritchard, inspected the barges that broke free from Lesperance Street fleet. Mr. Pritchard also found freshly broken wires which he explained were consistent with the Lesperance Street fleet experiencing an upstream end blow from a runaway barge (Vol. VI-B, p. 41, l. 11-21). Marine surveyor James Manley testified, "[w]e were certain then, and I'm certain now, that the cause of the Lesperance Street breaking away was that the fleet was struck by the ING barge." (Vol. IV-B, p. 85, l. 10-17).
37. Defendants argue that the Lesperance Street fleet should have been tied off in a manner so as to withstand the impact of the ING 5565. Engineers Paul Weis and William Manley testified barge fleet moorings are intended to withstand natural forces such as wind, waves and current, but not the impact of runaway barges; and that the ARTCO fleets were properly secured (Vol. V-A, pp. 34-36; Vol. IV-B, p. 50, l. 14-p. 51, l. 4). The Lesperance Street fleet tie-offs were checked shortly before the breakaway and found to be secure (Vol. II, p. 81).
38. The only evidence presented at trial regarding the impact forces involved and the holding strength of wires used to tie off barges was the testimony of Mr. Paul Weis. Mr. Weis has been a civil engineer for over forty years (Vol. V-A, p. 23, l. 22-25), with extensive experience in designing structures on the Mississippi River (Vol. V-A, p. 24, l. 24 to p. 25, l. 9).
39. Mr. Weis explained that the loaded barge ING 5565 weighed approximately 1,700 tons (or 3,400,000 pounds), which is the equivalent weight of 2,000 automobiles (Vol. V-A, p. 30, l. 4-14).
40. The steel cables securing the ART 381 to the PCBL 176 at the head of the Lesperance Street fleet were one-inch steel wire with a fiber core  the type of wire generally used to tie off fleets in the St. Louis harbor  and each wire was wrapped around deck fittings so there were three strands or "parts." There were two cables secured in this manner between the ART 381 and the PCBL 176 at the upstream end of the barges, resulting in 6 strands of wire, and each wire was tightened by a winch. The holding capacity or tensil strength of the wires between those two barges was 41.8 tons of force (Vol. V-A, p. 34, l. 11-18; Vol. V-A, p. 35, l. 23-25).
41. The force of impact when the ING 5565 hit barge ART 381 was more than 40 times the holding strength of the wires securing the Lesperance Street fleet, according to Mr. Weis' calculations (Vol. V-A, p. 34, l. 19-25).[6] Thus, when the ART 381 was struck by the ING 5565, it was inevitable that rigging securing barges at the Lesperance Street fleet would break and barges moored in that fleet would come loose. As additional barges came loose and struck other fleets, the magnitude of the forces increased, making the breakaway of barges in fleets struck further downstream inevitable (Vol. V-A, p. 39, l. 15  p. 40, l. 20).
42. At least fifteen tugboats from various harbor companies, including ARTCO, *1045 Paragon, Riverway Harbor Service ("Riverway") and Lewis & Clark, responded to the breakaway (Vol. IV-A, p. 58, l. 4-10).
43. When the breakaway began, eight or ten ARTCO boats were tied off near the ARTCO North dock, approximately three or four miles below the area where the breakaway began (Vol. II, p. 32, l. 13-16). These boats had crewmembers aboard and were in danger of being struck by runaway barges and possibly sinking (Vol. II, p. 34, l. 6-9).
44. ARTCO's M/V ANDREA LEIGH and M/V BILL PEHLER, along with a tugboat owned by Lewis & Clark (which is not a party to this action), the M/V MISS JULES, intercepted the runaway barges approaching the boats tied-off and guided those barges toward the middle of the river (Vol. II, p. 34, l. 10-24; Vol. III-A, p. 93, l. 8-13; Vol. II, p. 91, l. 19-25; Vol. II, p. 92, l. 5-9).
45. After protecting the moored boats near ARTCO North, the various harbor tugs began gathering loose barges. After assisting ARTCO tugs in protecting the lineboats at the ARTCO North dock, the M/V MISS JULES traveled downriver to attempt to corral loose barges (Vol. II, p. 93, l. 10-16; Plaintiff's Exhibit 117).
46. The MISS JULES came across a barge adrift in the river in the general vicinity of ARTCO's Reidy fleets (Vol. II, p. 94, l. 8-10). This barge was a loaded barge and was not attached to any other barges (Vol. II, p. 95, l. 16-17). Once the MISS JULES gained control over the barge, she brought that barge to the Arsenal Island fleet, on the Illinois side of the river (Vol. II, p. 96, l. 21-25; Vol. II, p. 126, l. 22 to p. 127, l. 3).
47. The single loaded barge captured by the MISS JULES was the ING 5565, previously moored in Defendant's Valley Main fleet. The mate of the MISS JULES, William Housley, identified the barge by number and testified that the MISS JULES faced up to the bow end of the ING 5565. (Vol. II, p. 124, l. 18-25).
48. The deckhand aboard the MISS JULES, Davy Dippold, testified that the barge was an Ingram barge (Vol. III-A, p. 24, l. 18-23). The pilot of the MISS JULES, Capt. Dwayne Vandygriff, recalled that the barge captured by his crew was an Ingram barge, with the number six in its call number (Vol. II, p. 93, l. 17-24). Mr. Vandygriff observed only one Ingram barge loose in the river on the evening of the breakaway (Vol. II, p. 97, l. 24 to p. 98, l. 1). Of the 137 barges involved in the breakaway, the lone Ingram barge was the ING 5565. Exhibits 107, 108, 109, 110 and 111 are diagrams that depict the identifying letters and numbers of each barge involved in the breakaway, as well as the position of each barge in a fleet prior to the breakaway.[7] As depicted in Plaintiff's Exhibit 94Q and 95A4, photos the ING 5565 taken shortly after the breakaway, "ING 5565" was clearly marked on the barge in large, white block letters.
49. Mr. Dippold testified that he grabbed a face wire of the MISS JULES and stepped onto the port bow corner of the Ingram barge (Vol. III-A, p. 26, l. 19). As he prepared to wrap the face wire around the port bow corner kevel of the Ingram barge, he noticed that a broken wire was wrapped around the kevel (Vol. III-A, p. 28, l. 1-6). The kevel was a deck fittings that would have been used to tie off the ING 5565 to the ING 5561 in the Valley Main fleet prior to the breakaway[8] *1046 (Plaintiff's Exhibit 108). The ends of the broken wire were frayed and the center core of the wire was hanging out (Vol. III-A, p. 28, l. 7-15). The break in the wire appeared fresh, as the frayed ends were shiny at their tips (Vol. III-A, p. 28, l. 16-17). The wires did not appear to have been cut (Id.). In order to enable him to use the kevel, Mr. Dippold removed the broken wire from the deck fitting and threw it into the river (Vol. III-A, p. 28, l. 4-6).
50. Mr. Housley also observed freshly broken wires on the port side of the ING 5565, at the stern end, when the barge was retrieved by the M/V MISS JULES (Vol. II, p. 127, l. 21 to p. 128, l. 2-9). This corner of the barge would have been the downriver end of the ING 5565, where that barge would have been tied to the ING 5561 when the two barges were in the Valley Main fleet prior to the breakaway (Plaintiff's Exhibit 108). The broken wires at this end of the barge were frayed, as opposed to cut (Vol. II, p. 127, l. 21 to p. 128, l. 2-9). Mr. Housley saw two broken ends to those wires (Vol. II, p. 128, l. 8-9). He cleared the deck of these broken wires, so he and other crewmembers securing the barge would not trip over them, and the broken wires ended up in the river (Vol. II, p. 128, l. 10-14).
51. After retrieving the ING 5565, the MISS JULES pushed it to the Arsenal Island fleet on the Illinois bank of the river. Mr. Housley and Mr. Dippold testified that they secured the barge in that fleet and left it there (Vol. II  p. 126, l. 22 to p. 127, l. 3; Vol. III-A, p. 29, l. 18-23).
52. The ANDREA LEIGH headed southbound and tried to protect ARTCO's Upper Reidy and Lower Reidy fleets from runaway barges (Vol. III-A, p. 93, l. 14-22). The ANDREA LEIGH caught two strings of six loaded barges each near Reidy Terminal and tied off these barges in the Arsenal Island fleet (Vol. III-A, p. 94, l. 24 to p. 95, l. 17; Vol. II, p. 34, l. 25 to p. 35, l. 5).
53. The Arsenal Island fleet is located on the left descending bank (the Illinois side) at approximately Mile Marker 174 on the Upper Mississippi River (Vol. III p. 41, l. 11-13). After tying off the two strings of barges, the mate of the ANDREA LEIGH then relayed the identifying numbers of each of the barges placed in the Arsenal Island fleet to the captain, Donald Teague, who recorded them in the vessel's logs (Vol. II, p. 40, l. 14-22; Plaintiff's Exhibit 33).[9] The ANDREA LEIGH and its crew then headed southbound towards the Jefferson Barracks bridge to assist in gathering additional barges (Vol. II,p. 34, l. 25 to p. 35, l. 5; Vol. II, p. 41, l. 20-23).
54. The morning after the breakaway, marine surveyors found the ING 5565 in the Arsenal Island fleet where the crew of the M/V MISS JULES said it had been tied-off by them (Vol. VI-B, p. 44, l. 15-22; Vol. IV-B, p. 48, l. 7-18). The ING 5565 was tied-off next to two strings of ARTCO barges, including the ART 381 (Vol. IV-B, p. 48, l. 19-24).[10]
*1047 55. Inspection of the ING 5565 revealed that barge had sustained recent damage on its starboard side (Vol. IV-B, p. 34, l. 17-22; Vol. V-A, p. 20, l. 20-24). Plaintiff's Exhibits 94T, 94U and 95W2 depict this damage. Surveyors also found fresh rub marks, scrapes and abrasions on both stern corners of the ING 5565 (Vol. IV-B, p. 34, l. 22-24; Plaintiff's Exhibit 95B4; Plaintiff's Exhibit 95W2).
56. The ART 381 had significant fresh damage to its bow headlog and the bow rake end of the barge was twisted (Vol. IV-B, p. 33, l. 7-10; Plaintiff's Exhibit 95B4). A large dent in the headlog was the shape of the stern corner of the ING 5565. Marine surveyor James Manley testified that "the shape of the damage to the ART 381, the head long plate was kind of concave, it was set in more above the bottom of it than it was above that, which indicated something pushed into it and let the areas above and below it stick out farther, which conformed roughly in shape to the corner on the ING barge (Vol. IV-B, p. 41, l. 7-12)." William Manley, a civil engineer who inspected the damages, explained that "the distortions on the ART 381 indicated to me that it had been hit with a square corner of a loaded barge (Vol. V-A, p. 9, l. 23-25)." Engineer Paul Weis testified that the damage to the headlog of the ART 381 matched the stern corner of the ING 5565 (Vol. V-A, p. 36, l. 16-18). James Pritchard, a surveyor retained by the Defendants, testified that the damage to the bow of the ART 381 appeared to match the square end corner of the ING 5565 (Vol. VI-B, p. 43, l. 8-12).
57. Engineer Paul Weis explained why the headlog of the ART 381 incurred more damage than the corner of the ING 5565:
Question: Would you have expected more damage to the corner of the 5565?
Answer: No, I wouldn't. There's a couple reasons for that. Even though the material is basically the same on the headlog as it is on the stern corner, the relative stiffness of the corner is substantially higher than what you would have on the headlog, particularly from the standpoint that the headlog itself on this particular barge was about 18 inches or so higher than the actual deck, which would make it even more susceptible on the 381, which would make it more susceptible to bending. So the damage that I saw is really pretty consistent with what I would expect.
You know, possibly I could give a little bit of an example to make everyone understand a little bit better of the relative stiffness that I'm talking about. If you would take  I just happen to think about this on the way down here this morning. If you take a cardboard box and you set it with no top on it and you set it on the floor, and if you would push on the side of the box at the top, it would bend relatively easily. Now, take that  and that would be kind of synonymous with the headlog of the 381.
Now, if you take that same box, cardboard box, it's still the same material, same thickness material, and you turn it over upside down and now you push on the corner of the box, You can see you would have a hard time pushing the corner of that box in as opposed to pushing in the top of the box on the side. And that's exactly the kind of situation we have in that impact forces are transmitted in compression down both sides, the transom and the side of the 5565 as well as the top deck, all receiving these forces in a compression situation, which is much more rigid.
Conversely, the 381 is receiving these forces in a bending situation. And you would expect that there would be quite a bit of damage to the 381, relatively little damage to the 5565.
(Vol. V-A, p. 34, l. 16  p. 38 l. 4)
*1048 58. Further, the height above water level of the large dent in the headlong of the ART 381 matched the height of the stern corner of the ING 5565. As marine surveyor James Manley explained, the level of freeboard[11] at the stern of the ING 5565 matched up with the freeboard level of the dent found on the ART 381. "[T]he elevation, the height of the ING barge above the water was roughly the same elevation as the ARTCO barge (Vol. IV-B, p. 41, l. 13-15)." Since the ING 5565 had a lighter load than most river barges, it likely rode higher in the water than most other loaded barges involved in the breakaway (Vol. V-A, p. 10 and 11, l. 6-8).
59. The total number of barges loose in the St. Louis Harbor on the night of the breakaway was 137 (Vol. II, p. 4, l. 10-12). 102 of the 137 barges had been moored in Plaintiff's fleets (Vol. II, p. 4, l. 15-19). The remaining barges came from other fleeting companies whose fleets were also struck during the breakaway (Vol. IV-B, p. 31, l. 10-20). Barges involved in the breakaway collided with one another, struck fixed objects and ran aground, causing substantial damage. One ARTCO barge sank below the Jefferson Barracks Bridge (Vol. IV-B, p. 29, l. 15-16).
60. Many of the ARTCO barges sustained damage and required repairs (Vol. II, p. 5, l. 20-21). Plaintiff incurred damages for these repairs, as well as for cargo loss, broken rigging, surveying, shifting, salvage and related expenses (Vol. II, p. 5, l. 21-23). Plaintiff's stipulated damages as a result of the incident are $1,544,713.00 (Joint Stipulation of Facts, paragraph 15; Vol. II, p. 5, l. 24-25).[12]
61. The only evidence submitted by either party regarding prevailing interest rates was from the Plaintiff. This evidence consisted of the certified records of the St. Louis Federal Reserve Bank (Plaintiff's E). According to these records, the average prime lending rates from April 24, 1998 to the date of the trial was 8.52 percent per year.

Measures taken to secure barges.
62. Once ARTCO demonstrates that a barge in the care of Defendants left its moorings and struck other moored barges, the burden shifts to the Defendants to demonstrate that they undertook all measures available that could have prevented the ING 5565 from coming loose from its moorings.
63. Carl Berthelot, manager of Paragon, testified Paragon had no written policies on how Paragon crew members were to tie-off barges in Paragon fleets (Vol. IV-A, p. 18, l. 7-14).
64. Paragon had no written policies as to how or when the barges were to be inspected (Vol. IV-A, p. 18, l. 15-21).
65. Mr. Berthelot admitted that Paragon had no written policies on fleeting measures to be taken during adverse conditions (Vol. 18, l. 22-25).
66. Paragon did not have a specially designated safety officer (Vol. IV-A, p. 19, l. 1-3). This is true despite the fact that the agreement between CGB and Paragon required a safety officer (Plaintiff's Exhibit 114, p. 36, l. 20-25).
67. The disregard for fleet safety on the part of Defendants contrasts with the procedures of Plaintiff, who maintained written fleeting procedures and enforced those requirements (Vol. IV-B, p. 6, l. 21-25; Vol. II, p. 13, l. 13-18). The written *1049 procedures were used to train new employees and standardize ARTCO's fleeting practices (Vol. II, p. 14, l. 7-10; Vol. III-A, p. 85, l. 8-13). The written procedures also addressed the tying off and monitoring of barge fleets (Vol. II, p. 14, l. 14-16). Each employee received a copy of the fleet tie-off requirements and the requirements were posted aboard Plaintiff's tugs in the St. Louis Harbor (Vol. II, p. 14, l. 23 to p. 15, l. 2). The procedures were discussed at ARTCO safety meetings (Vol. II, p. 72, l. 12-17; Vol. III-A, p. 85, l. 20-22). Plaintiff's written inspection policy requires members of the deckcrew to check the tie offs at the head of each fleet at the beginning of every watch (Vol. II, p. 20, l. 25 to p. 21, l. 4). The tie offs are to be inspected whenever a harbor tug placed barges into a fleet or removed them from the fleet (Vol. II, p. 21, l. 7-11). Further, it was the practice of ARTCO employees to check the tie-offs of remaining barges after shifting barges within a fleet (Vol. II, p. 21, l. 12-13).
68. ARTCO maintained a formal safety program at the time of the breakaway (Vol. IV-B, p. 8, l. 2-4). ARTCO had an on-staff, full-time safety coordinator, responsible for overseeing the safety program (Vol. IV-B, p. 8, l. 5-17). ARTCO conducted safety meetings twice a month, which all crewmembers attended (Vol. IV-B, p. 8, l. 18-24). At ARTCO, newly hired employees underwent a day-and-a-half to two-day safety and training orientation before beginning to work out on the river (Vol. IV-B, p. 9, l. 8-16). New deckhands were also shown numerous safety videos (Vol. II, p. 22, l. 17 to p. 23, l. 2; Vol. I-B, p. 9, l. 17-25). ARTCO provided them with a list of forty-six safety rules and gave them a tour of the facility (Vol. IV-B, p. 10, l. 1-6). Inexperienced deckhands were paired with a training mate for their first two weeks of work on the river, during which they worked the day shift only (Vol. IV-B, p. 10, l. 7-13).
69. Defendants' management did not take most of the above measures, which promoted safe, consistent and appropriate barge fleeting practices and prevented barge breakaways. Retired Coast Guard officer and marine and safety expert Douglas Halsey explained that such procedures by fleet management are essential for safe barge fleeting and that lax management, such as existed at Paragon, results in breakaways (Vol. V-B, p. 15-16, l. 3-22).
70. Moreover, when Paragon tugs shifted the ING 5565 and other barges in the Valley Main Fleet few hours before the breakaway, the wires mooring the ING 5565 to the ING 5561 were not adequately checked after the shifting occurred, as they should have been. These were the very wires that failed, causing the ING 5565 to break loose. The tie-offs between those two barges were checked before the barges were shifted, but they were not checked after the barges were shifted out into the river and back into the Valley Main Fleet (Vol. VI-A, p. 37, l. 22  p. 39, l. 2). Mr. Halsey stated, and admiralty law requires, that when barges are moved in the manner that the ING 5565 and ING 5561 were, prior to the breakaway, the wires between the barges must be inspected after the shifting occurs (Vol. V-B, p. 10, l. 16  p. 11, l. 6). Failure to make such inspections and any adjustments that may be required can readily result in loose wires breaking or coming undone (Vol. V-B, p. 19, l. 2  p. 18, l. 8).
71. Two of the four assigned crewmembers of the M/V JOHN WALKER (the Paragon tug that resecured the shifted barges) were absent when the barges were shifted at the Valley Main fleet prior to the breakaway. One of the assigned deckhands came to work late and another left work (Vol. VI-A, p. 36, l. 17-25).
72. Paragon failed to prove it took all measures available to prevent barge ING *1050 5565, which was in Paragon's care and custody, from breaking loose from its moorings and causing a larger breakaway. Paragon crewmembers were not properly instructed and directed in proper mooring and inspection practices by Paragon management. Shortly before the breakaway, Paragon crew failed to check and properly secure the mooring wires between the ING 5565 and the ING 5561, after those barges were shifted by Paragon tugs in the Valley Main fleet.

Evidence of Vis Major.
73. Defendants submitted no evidence regarding prevailing weather conditions and made no claim that an extraordinary meteorological event, such as a tornado, hurricane, flood or snowstorm caused the ING 5565 to break free.

Evidence Of Inevitable Accident.
74. Similarly, Defendants provided no evidence of inevitable accident. This affirmative defense also places the obligation on the party invoking it of showing how the incident and occurred and, further, that the incident could not have been avoided. Defendants submitted no evidence suggesting an inevitable accident caused the ING 5565 to come loose, or that such an accident could not have been avoided. The evidence presented established that the breakaway could have been prevented had wires securing barge ING 5565 been properly inspected after the barge was shifted shortly before the breakaway and had the Paragon fleet been properly managed. For these reasons, the defense of inevitable accident is also unavailable.

Evidence of Sabotage.
75. The defense presented at trial by Paragon and CGB was that the ING 5565 was deliberately set free by a criminal act of sabotage.
76. Defendants aver that an unknown criminal climbed aboard the Valley Main fleet on the evening of April 24, 1998, walked four barge widths across the head of the fleet and deliberately loosened the wires connecting barge ING 5565 to the adjacent barge ING 5561, thereby setting the ING 5565 free in the river. Not one witness who testified at trial claimed he saw anyone deliberately set free the ING 5565 or any unauthorized person on barges in the Valley Main fleet or in the area of the fleet.
77. Although various river companies posted a $25,000 reward for information leading to the arrest of a saboteur, if one existed, the reward was never claimed in the three years since the breakaway and resulted in no information supporting the sabotage theory (Vol. IVA  p. 28, l. 13-17). No one has ever been charged, arrested, or convicted of the supposed sabotage (Vol. IVA  p. 28, l. 18-21). In short, Defendants provided no credible evidence that the barge was deliberately set free.
78. While it is true that the initial speculation as to how the ING 5565 broke free included the possibility of sabotage, this theory was premised almost entirely upon the fact that when the ING 5565 was inspected by marine surveyors on the morning after the breakaway, no broken wires were found on the ING 5565.
79. Surveyor James Manley explained the significance of the absence of broken wires at the time of this initial inspection, in response to questioning by the Court:
Question (by the Court): Mr. Manley, you testified that you indicated  that you told Mr. Patterson that you believed that this incident was a result of sabotage, but yet today you testified that it was a result of this Ingram 5565 barge. Why have you changed your opinion and what happened there?
Answer: No. Early on the assumption was that  because we didn't find any broken rigging on the ING 5565 or the *1051 barge next to it, the ING 5561, immediately everybody assumed with no broken rigging this thing had to be turned loose.
If your barge breaks loose, you're going to have broken rigging hung on one barge or another. Part of it is going to be laying or hung up on the deck fitting on one side or the other. It doesn't just evaporate.
When we didn't find any broken rigging, the assumption immediately was, because we've got a labor dispute in progress, somebody must have turned this barge loose because we didn't have any other explanation.
And then I was subsequently told that deckhands did say, We kicked broken rigging off of this barge, the ING 5565, when we caught it floating down the river to clear up those deck fittings so we could tie it off on the Riverway fleet.
(Vol. IV-B, p. 84, l. 1-24). Mr. Patterson also testified that the absence of broken wires on the ING 5565 deck fittings was one of the "main reasons" that people thought sabotage may have occurred (Vol. VI-B, p. 19, l. 17-22).
80. None of the proponents of the sabotage theory obtained any information from the crew members of the M/V MISS JULES, the vessel that caught the ING 5565 during the breakaway and then secured it in the Arsenal Island Fleet. Mr. Patterson testified:
Question: [T]he day after the breakaway, the week after the breakaway, several months after the breakaway, did you ever talk to crew members of the M/V MISS JULES which recovered [the ING 5565]?
Answer: Not to my knowledge, no.
Question: So you never found out from the people who actually recovered it on the evening of the breakaway whether or not they found broken wires on the ING 5565, did you?
Answer: No, I did not.
(Vol. VI-B, p. 19, l. 23 to p. 20, l. 20). A marine surveyor hired by Defendants, Mr. James Pritchard, also had not spoken with the crew of the M/V MISS JULES at the time that he theorized that sabotage may have occurred (Vol. VI-B, p. 44, l. 23-25).
81. The freshly broken wires found by the crew of the M/V MISS JULES lead this Court to find that the ING 5565 broke free from its moorings in the Valley Main fleet and was not set free by an unseen saboteur who deliberately released the wires. The sabotage theory was premised on the absence of broken wires on the ING 5565 after the breakaway. The evidence shows there were broken wire when the barge was recovered during the breakaway, which were discarded in the course of efforts to capture and resecure the barge. Further, there is not direct evidence that sabotage occurred.[13]
82. The Court also notes that the crew-members of the M/V MISS JULES who testified there were broken wires on the port side of the ING 5565 when they recovered it during the breakaway provided statements to federal investigators shortly after the breakaway, which were consistent with their recollections at trial concerning the location of the freshly broken wires, the identity of the barge at issue, and the placement of the barge in the Arsenal Island fleet after it was secured during the breakaway (Vol. III-A, pp. 28-29; Vol. II, pp. 130-131). The fact that *1052 freshly broken wires were found at the two tie-off points between the ING 5565 and the ING 5561 indicates that the barge broke free from the Valley Main fleet, as opposed to being set free deliberately.

Available Measures to Prevent Unauthorized Access to its Fleet.
83. Moreover, even assuming for the sake of argument that a criminal act did occur, Defendants failed to demonstrate that alternative methods of securing their fleets could not have prevented the purported criminal saboteur from accessing the Valley Main fleet as alleged.
84. The security in place at Paragon's offices and Valley Main fleet in the early spring of 1998 was inadequate. Mr. Berthelot admitted that Paragon had no fences, no alarm systems, and no surveillance cameras at its facilities, including the Valley Main fleet, in April of 1998 (Vol. IV-A, p. 22, l. 13-16). Paragon did not have a security guard at its facility at the time of the breakaway, and only hired a security guard after the breakaway (Vol. IV-A, p. 21, l. 20-23, p. 22, l. 13-20; Vol. VI-B, p. 25, l. 16-18). Paragon had no "Keep Out" or "No Trespassing" signs at its facility (Vol. IV-A, p. 21, l. 24 to p. 22, l. 2).
85. The upstream-most fleet barge closest to the Missouri bank of the Mississippi River at the Valley Main fleet was hard aground on the night of the breakaway, with a fixed ladder on the barge providing access to the fleet (Vol. IV-A, p. 24, l. 11-16; Vol. IV-B, p. 54, l. 12-15). It had been hard aground for at least several days prior to the breakaway (Vol. IV-B, p. 64, l. 25 to p. 65, l. 1). Plaintiff's Exhibits 92A and 97N demonstrate the position of the fleet barge on the evening of the breakaway. The barges should have been pulled off the ground and out into the river, which would make access to the fleet by unauthorized persons far more difficult.
86. As one marine surveyor explained, "[i]f the fleet barge had been pulled out into the river and was afloat, someone would have had to wade out in the river, and not knowing how deep it was, they'd have had a lot harder time getting up on that barge (Vol. IV-B, p. 55, l. 19-25)." The Valley Main fleet is presently configured in such a manner that no ladder exists and the fleet is at least thirty feet out into the Mississippi River, as demonstrated by Plaintiff's Exhibits 99, 99A, 99B and 99C, which are photographs taken of that fleet shortly before trial.
87. Thus, the combination of the barge being hard aground, in tandem with the ladder attached to that barge, furnished ready access to any unauthorized individual desiring to board the fleet.
88. In addition, the Court finds that, with regards to security, the Defendants should have been on "heightened alert" due to the fact that a labor dispute was ongoing at the time the breakaway occurred. In April of 1998, labor unrest resulted in a walkout by Paragon pilots working in the St. Louis harbor. Any labor stoppage or strike, including the Pilots Agree work stoppage, involves confrontation (Vol. V-A, p. 73, l. 21 to p. 74, l. 10). When the strike began, approximately ten Paragon pilots and two Paragon deckhands went out on strike and refused to work (Vol. IV-A, p. 62, l. 5-11).
89. Many of the striking pilots at Paragon joined the strike because they were concerned about the safety record of Paragon (Vol. IV-A, p. 63, l. 1-6; Vol. IV-A, p. 69, l. 1-3). Ten days after the strike began, and approximately ten days before the breakaway, Paragon fired its striking pilots (Vol. IV-A, p. 68, l. 8-10; Vol. IV-A, p. 21, l. 5-10; Vol. IV-A, p. 67, l. 25). The striking pilots had no strike fund, and by the time of the breakaway the strikers had been out for three weeks and had missed *1053 two paychecks (Vol. IV-A, p. 63, l. 1-6, Vol. IV-A, p. 68, l. 8-10, Vol. IV-A, p. 69, l. 1-3). Yet, Defendants took no measures to secure their facilities and property in their custody (Vol. IV-A, p. 22, l. 10-12; Vol. V-A, p. 74, l. 18-19; Vol. V-A, p. 76, l. 5-10). Such measures would surely have greatly reduced the likelihood of unauthorized access to Paragon fleets (Vol. V-A, p. 76, l. 21 to p. 77, l. 4).
90. The contention of the Defendants that these modest methods of providing additional security at their fleets were unnecessary is belied by the fact that Defendants did in fact take such precautions after the breakaway had occurred. Immediately after the breakaway, Paragon hired a security guard in order to prevent any additional problems (Vol. IV-A, p. 22, l. 17 to p. 23, l. 6; Vol. VI-B, p. 20, l. 19-24). A few days later, a Paragon harbor tug pulled the Valley Main fleet barge off the Missouri bank (Vol. VI-B, p. 21, l. 2-5). Still later, Paragon completely reconfigured the Valley Main fleet to prevent that fleet barge from ever resting hard aground on the Missouri bank of the River (Vol. IV-A, p. 26, l. 10-14). Paragon also removed the ladder which had been affixed to the fleet barge (Vol. IV-A, p. 26, l. 10-14).
91. Even if sabotage had been proved to be the cause of the breakaway, Defendants did not satisfy their burden of proving they adopted reasonable security measures to prevent such an act.

Defendants' Burden of Proving that Negligence on the Part of ARTCO Contributed to the Breakaway.
92. ARTCO was not contributorily negligent in any respect. The ARTCO fleets were properly moored at the time of the breakaway (Vol. IV-B, p. 51, l. 15-21). No ARTCO fleets were unusually wide that evening (Vol. IV-B, p. 11, l. 6-10). The number of barges contained in ARTCO fleets and the width of those fleets at the time of the breakaway complied with all applicable governmental regulations and constituted the proper width for conditions then-existing (Vol. V-B, p. 14, l. 12-22; Vol. IV-B, p. 11, l. 22 to p. 12, l. 8).[14]
93. Witnesses testified that ARTCO barges were securely moored and would not have come free from their moorings had runaway barge ING 5565 not struck the Lesperance Street fleet and started the breakaway. Jason Powers, the mate who inspected ARTCO's Lesperance Street fleet several hours prior to that fleet being struck by the ING 5565, testified that barges would not have come out of that fleet if it had not been hit by the runaway barge (Vol. IIp. 83, l. 5-7). Marine safety expert Douglas Halsey stated:
Question: What's your opinion as to whether those fleets would have broken loose absent the ING barge coming down and hitting them?
Answer: They would have remained as moored. They were more than adequately moored.
(Vol. V-B, p. 14, l. 7-10).
94. Defendants stipulated during trial that ARTCO tugs acted prudently in the aftermath of the breakaway (Vol. II, p. 93, l. 1-6).
95. Moreover, ARTCO's facilities and fleets were properly secured at all times. The ARTCO office complex and nearby ARTCO fleets were fenced off long before the strike, with a guard at the entry gate (Vol. III-B, p. 83, l. 14-24). There was also a surveillance camera that permitted *1054 remote observation of the road approaching the ARTCO premises. Once the strike began, extensive additional security measures were taken to protect persons and property. ARTCO implemented a twenty-four hour a day roving patrol at their fleets, which involved two security officers in an automobile (Vol. III-B, p. 84, l. 11-25). The roving patrol inspected the river-bank adjacent to each fleet to check for and deter intruders (Vol. III-B, p. 84, l. 11-25). Although these guards were unarmed and trained to be nonconfrontational with strikers, their presence, along with the video cameras at their side, served as a significant deterrent to those who might wish to engage in unlawful conduct (Vol. III-B, p. 89, l. 11-20).
96. Defendants failed to demonstrate that any negligence on the part of Plaintiff caused or contributed to the breakaway of April 24, 1998.

CONCLUSIONS OF LAW

I. The ING 5565 Came Loose From Its Moorings, Traveled Downstream Unattended, and Struck ARTCO'S LesPerance Street Fleet, Resulting in the Barge Breakaway of April 24.

A. Admiralty Cases are Decided by the Court and Findings of An Advisory Jury are Non-Binding.

a. The Court has jurisdiction over this case pursuant to its admiralty jurisdiction, 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure. 28 U.S.C. § 1333(1) provides in part that "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of ... [a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." Venue is proper as the incident at issue occurred within this judicial district.
b. Plaintiff brought the present claim pursuant to Rule 9(h) and expressly invoked the admiralty jurisdiction of this Court. Suits in admiralty are not jury cases. FED. R. Civ. P. 38(e). Suits brought pursuant to Rule 9(h) are to be tried by judge and not by a jury. Koch Fuels, Inc. v. Cargo of 13,000 Barrels of No. 2 Oil, 704 F.2d 1038, 1041 (8th Cir. 1983). This case was tried to the Court in the presence of an advisory jury. Although neither party sought the advisory jury, the Court empaneled the advisory jury pursuant to FED. R. CIV. P. 39(c), which provides, in pertinent part, that "[i]n all actions not triable of right by a jury the court upon ... its own initiative may try any issue with an advisory jury ..."
c. In the Eighth Circuit, "[t]he responsibility for the decision making process remains with the judge even though an advisory jury is used." Indiana Lumbermens Mut. Ins. Co. v. Timberland Pallet & Lumber, Co., Inc., 195 F.3d 368, 376 (8th Cir.1999). As the Court explained in that case, the trial court "must prepare the findings of fact and conclusions of law, and it is in its discretion wholly whether to accept or reject, in whole or in part, the verdict of the jury." Id. Importantly, the Court rejected the argument advanced in that case that the trial court should adopt the findings of fact reached by the advisory jury unless such findings are "clearly erroneous." Id. The Eighth Circuit explained that these arguments "misconceive the function of an advisory jury and the complete freedom the judge has in using or disregarding its findings." Id. "Review on appeal is of the findings of the [district] court as if there had been no verdict from an advisory jury ..." Id. Accordingly, this Court retains complete freedom to adopt or disregard the findings of the advisory jury in this case. The findings of fact and conclusions of law announced in this opinion are those of this Court alone.
d. The present case involves complicated, mixed questions of law and fact. *1055 There are three legal theories of liability that apply, as explained below, each of which involves presumptions and shifting burdens of proof. Extensive caselaw governs the responsibilities of fleeters in particular circumstances, the elements of defenses such as vis major and inevitable accident, duties regarding security of vessels held in bailment, and other pertinent issues. Since such matters are best understood and decided by a judge, it is not surprising that admiralty law requires trial by judge. In the present case, the advisory jury was instructed on some, but not all, applicable legal theories; it addressed some, but not all, pertinent factual issues; and it seemed to understand some of the issues addressed, but not others. It is the Court's duty to make findings it believes are supported by the evidence presented and applicable law.

B. The Louisiana Rule Creates a Presumption of Fault on the Part of the Defendants and the Defendants Have Failed to Overcome the Presumption.

e. "A fleet operator has the responsibility for insuring proper resecuring of barges after other barges have been removed from the fleet." Martin Oil Service v. John I. Hay Co., 219 F.2d 237 (5th Cir.1955); Lower River Ship Services, Inc. v. Casteel, Inc., 1991 WL 13867 (E.D.La. Jan.30, 1991). "A tug that removes a barge from a fleeting area, moving other barges in the process, is bound to ensure that remaining barges are properly secured and that all mooring lines affected by the movement are proper and fast." Dow Chem. Co. v. Barge UM-23B, 287 F.Supp. 661 (E.D.La.1968); Federal Barge Lines, Inc. v. Star Towing Co., 263 F.Supp. 981 (E.D.La.1967); Lower River Ship Services, 1991 WL 13867 at *4.
f. When a collision is caused by a vessel drifting from her moorings, the moving vessel is presumed to be at fault until the presumption is offset by affirmative proof that absolves her. The Louisiana, 70 U.S. (3 Wall.) 164, 173, 18 L.Ed. 85 (1865); Pasco Marketing, Inc. v. Taylor Towing Service, Inc., 554 F.2d 808, 810 (8th Cir.1977); Ohio River Co. v. Great Lakes Carbon Corp., 562 F.Supp. 61, 64 (E.D.Mo.1982); Monsanto Co. v. Port of St. Louis Investments, 350 F.Supp. 502, 516 (E.D.Mo.1972).
g. In The Louisiana, the Supreme Court sets forth the presumption of fault which arises when a barge is allowed to come free from its moorings and strikes various objects:
The collision being caused by the Louisiana drifting from her moorings, she must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a vis major, which human skill and precaution and a proper display of nautical skill could not have prevented ... [a]nd the fact that under these circumstances she did drift, is conclusive evidence that she was not sufficiently and properly secured.
70 U.S. (3 Wall.) at 174.
h. "The Louisiana and its progeny create a presumption of fault at the time of the accident." Hood v. Knappton Corp. Inc., 986 F.2d 329, 332 (9th Cir.1993). In light of this approach, the Eighth Circuit held in Pasco Marketing that when "this presumption operates[,] the duty of producing evidence shifts to the mooring vessel ..." 554 F.2d at 810. In another case, the Eastern District of Missouri held that "[a] breakaway establishes a prima facie case of negligence against the moving vessel." Monsanto Co. v. Edwards Towing Corp., 318 F.Supp. 13, 15 (E.D.Mo.1969).[15]
*1056 i. Judge Learned Hand explained the rationale for this presumption of fault in Cranberry Creek Coal Co. v. Red Star Towing & Trans. Co., 33 F.2d 272, 274 (2d Cir.1929):
[T]here are situations in which the law does not put the duty upon the sufferer to make proof at the outset; either because the facts are especially within the [fleeter's] knowledge, or ... because usually there must be some fault, it is thought just to require the owner to explain, and if he does not, to charge him ... [T]he [fleeter's] duty is often spoken of as the defense of "inevitable accident." Strictly, it is no defense at all, but a true presumption; that is to say, a duty laid upon him to supply proof which costs him if he fails. This duty extends not only to disclosing what happened, but ... what would have been necessary to prevent it.
j. The presumption of negligence has been applied in numerous cases involving vessels which are allowed to break free from their moorings and strike other vessels or structures. These cases illustrate the heavy burden placed on the party having custody of the drifting barge. In Pasco Marketing, the Eighth Circuit upheld the district court's determination that the charged party, who had moored barges which subsequently broke free, had offered no evidence save its self-serving, conclusory statements that it had done everything possible to avoid the breakaway, and as a result concluded the presumption had not been overcome. 554 F.2d at 812.
k. In Lower River Ship Services, 1991 WL 13867 at *1, the Eastern District of Louisiana applied the presumption to a situation remarkably similar to the case at bar. In that case, Casteel operated a barge fleeting facility on the Mississippi River. On the evening of February 15, 1989, the Casteel fleet contained 13 barges. Id. Inland Push Boat Service operated the M/V STACEY GRACE, which pulled four barges from the inside of the Casteel fleet. Id. at *2. It also shifted other barges in that fleet. Id. The barges which had been shifted and remoored by the M/V STACEY GRACE, came loose and drifted downriver. Id. These drifting barges struck and sunk a crewboat, the M/V DAN B. Id. at *3.
l. When the owner of the DAN B filed suit against Casteel, the fleet operator named Inland as a third-party defendant. Id. at *4. The district court began its analysis by noting the presumption of fault which arises when a fleeted vessel is allowed to leave its moorings, citing the *1057 Eighth Circuit's opinion in Pasco Marketing. Id. The court found the presumption applicable because the barges had broken free shortly after the shifting occurred and invoked the presumption against both Inland, the party who shifted the barges in the fleet, and against Casteel, the operator of the fleet. Id. With regards to Inland, the Court held that "[b]ecause the crew of the M/V STACEY GRACE had the last contact with the barges, this Court finds as a matter of law that Inland has failed to overcome the presumption that it negligently and improperly moored the barges, proximately causing the breakaway." Id. at *5. As to Casteel, the court found that the fleet should have been checked after the shifting of barges in its fleet. Id. at *6. "Casteel admittedly failed to have anyone inspect the mooring connections of the four barges shifted within the barge fleet by the M/V STACEY GRACE." Id. As neither defendant in that case overcame the presumption of negligence, the district court apportioned liability as sixty percent upon Inland and forty percent upon Casteel. Id. Other cases holding that a tug that removes a barge from a fleeting area, moving other barges in the process, is bound to ensure that the remaining barges are properly secured and that all mooring lines affected by the movement are proper. Dow Chem. Co. v. Barge UM-23B, 287 F.Supp. 661 (E.D.La.1968); Federal Barge Lines, Inc. v. Star Towing Co., 263 F.Supp. 981 (E.D.La.1967).
m. In much the same way, the Defendants in this case have failed to overcome the presumption of negligence. The only difference between this case and the Casteel case is that the Defendants in the case at bar have incurred liability as both the fleet operator and as the operator of the tug which shifted barges in the Valley Main fleet on the night of the breakaway.
n. The Court has found that the ING 5565 came free from the Valley Main fleet on the evening of April 24, 1998, traveled downstream, struck the Lesperance Street fleet and knocked twenty-five loaded barges loose from that fleet. These barges then traveled downstream and set free an additional 112 barges. As the Court has found that the ING 5565 barge left the care, custody and control of the Defendants, drifted down the Mississippi River and collided with ARTCO's barges, the Court accordingly presumes that the Defendants acted in a negligent manner in allowing a vessel in their custody to break free.
o. As discussed below, Defendants have failed to provide "affirmative proof" to absolve them of their liability and to overcome the presumption of their negligence. Because Defendants failed to prove that they took all actions that could have prevented the breakaway of barge ING 5565, Defendants are liable. The Lower River Ship Services v. Casteel case establishes a duty by the barge fleeter and shifting tugs to inspect tie-offs and insure they are fast and secure after barges in a fleet are shifted. In the present case, undisputed evidence establishes that a few hours before the breakaway barges in Defendants' Valley Main Fleet, including the ING 5565 and ING 5561, were shifted by Defendants' tugs M/V FRANCIS and M/V JOHN WALKER (Vol. IV-A, p. 43, l. 9 p. 47, l. 12; Vol. VI-A, p. 46, l. 215). After the barges were shifted, Defendants crew did not check the moorings between the ING 5565 and the ING 5561 to insure they were secure (Vol. VI-A, p. 38, l. 1619C). These were the very moorings that failed starting the breakaway. Under principle set forth in Lower River Ship Services and other cases cited above, Defendants are liable as a matter of law in these circumstances.
p. Further, Defendants management of its fleeting operation was lax, as there *1058 were no written proceedings regarding how and when barges were to be moored and inspected, there was no formal safety program, and there was no requirement that tie-offs in fleets be inspected after barges were shifted. Sound management of the Paragon fleet surely could have prevented the barge breakaway involved here. Accordingly, Defendants have failed to rebut the presumption that their negligence caused the breakaway and have failed to prove they took all measures that could have prevented it.

II. Defendants Are Liable Under the Doctrine of Res Ipsa Loquitor.

q. The Court reaches an identical conclusion when utilizing an alternative analytic framework. The Eighth Circuit has moved towards a simple application of the common law negligence doctrine of res ipsa loquitur in admiralty cases and has specifically done so in drifting vessel cases. In Agri-Trans Corp. v. Peavey Co., 742 F.2d 1137, 1138 (8th Cir.1984), the Court held that a plaintiff may satisfy the burden of proving negligence by inference when it is possible to conclude, from the nature of the damage sustained, that "there was ... more basis for attributing the damage to some kind of incident that likely would not have occurred without negligence on the defendant's part, than for attributing it to some kind of incident likely not involving negligence by the defendant." Id. at 1139. Accordingly, the Agri-Trans Corp. case allowed for an inference of negligence in admiralty cases without expressly relying upon the common law doctrine of res ipsa loquitur.
r. In Lone Star Indus., Inc. v. Mays Towing Co., Inc., 927 F.2d 1453, 1457 (8th Cir.1991), the Eighth Circuit expressly recognized the applicability of res ipsa loquitur in admiralty cases. A district court may properly apply res ipsa loquitur, upon satisfaction of the doctrine's three general requirements: (1) the injured party was without fault; (2) the instrumentality causing the injury was under the exclusive control of the defendant; and (3) the mishap is of a type that ordinarily does not occur in the absence of negligence. Id. Under this approach, a court should adopt an inference of negligence when the sustained damage "is more probably than not the result of negligence." Id. at 1458.
s. In the case at bar, the Court concludes that each of the three res ipsa loquitur elements have been satisfied. As discussed below, Defendants presented no credible evidence that fault on the part of Plaintiff caused or contributed to cause the April 24, 1998 barge breakaway. To the contrary, ARTCO deckhands Jason Powers and Maury Gardner inspected the first fleet struck by runaway barge ING 5565 a few hours before the fleet was struck. The fleet tie-offs at the Lesperance Street fleet were tight and properly secured at that time. Second, it is undisputed that the instrument which caused the harmhere, the ING 5565 bargewas in the exclusive custody and control of the Defendants at the time it left Defendants' Valley Main fleet (Joint stipulation of Facts, paragraphs 9a-d, 10; Vol. IV-A, p. 15, l. 4p. 17, l. 5). Finally, the act of a barge coming free from its moorings and traveling down river unattended is not the type of event which ordinarily occurs in the absence of negligence by the party having custody and control of the barge. As the Supreme Court stated in The Louisiana: "... the fact that under these circumstances she did drift, is conclusive evidence that she was not sufficiently and properly secured." 70 U.S. (Wall.) at 174. Thus, each of the res ipsa loquitur elements are present in this case, warranting the imposition of liability on Defendants on a second, independent basis.

*1059 III. Defendants are Liable as Bailees of the ING 5565.

t. Defendants are also liable as bailees of the ING 5565 barge. A "bailee for hire must insure that barges entrusted to his care are adequately moored at all times." Federal Barge Lines, Inc. v. Star Towing Co., 263 F.Supp. 981, 984 (E.D.La. 1967). Delivery by a bailor and acceptance by a bailee of the subject matter of the bailment creates a bailment. Federal Barge Lines, Inc. v. Granite City Steel, 608 F.Supp. 142, 148 (E.D.Mo.1985). A bailment obligates the bailee to exercise ordinary care to protect the subject of the bailment. Id. (citing Ohio River Co. v. Peavey Co., 731 F.2d 547 (8th Cir.1984)).
u. The operator of a fleeting facility as bailee has the responsibility of caring for a barge after it is committed to its custody. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 111, 62 S.Ct. 156, 86 L.Ed. 89 (1941); Monsanto v. Edwards Towing Corp., 318 F.Supp. 13 (E.D.Mo.1969). When a bailment exists and the property in its custody gets loose and causes damage, a presumption arises that the bailee's negligence caused the damage. Ohio River Co. v. Great Lakes Carbon Corp., 562 F.Supp. 61, 64 (E.D.Mo.1982). "The application of negligence to bailees is more appropriate when the circumstances are in doubt, such as a breakaway." United Barge Co. v. Notre Dame Fleeting & Towing Service, Inc., 568 F.2d 599, 602 n. 6 (8th Cir.1978). "The burden of producing evidence is then cast upon the bailee because he is generally in a better position than the bailor to know the cause of the loss and to show it was one not involving the bailee's liability." Id.
v. As bailee of the breakaway ING 5565 barge, Defendants bear responsibility for any damage caused by that barge. Such an approach is particularly appropriate in this case as the precise manner in which the ING 5565 barge came loose from its moorings is unknown, as no witness testified he or she saw the barge come out of the Valley Main fleet. The result of the barge coming loose is that the burden shifts to the Defendants to prove that their negligence could not have caused the breakaway. Defendants have not met this burden.
w. In their pretrial brief, Defendants cite Midland Enterprises, Inc. v. Notre Dame Fleeting & Towing Service, Inc., 538 F.2d 1356 (8th Cir.1976), for the proposition that a bailee for hire satisfies his burden of monitoring his fleets simply by having his employees visually inspect a fleet as they pass the fleet on their way to another location. That case is inapplicable to the present situation. The Midland Enterprises case involved an allegation by Midland that Notre Dame fleeting acted negligently in failing to have a watchman monitor a Midland barge moored by Notre Dame. A leak in the fleeted barge caused it to slowly sink while in the custody of Notre Dame. The Midland Enterprises case did not involve a barge breakaway, did not involve issues of preventing unauthorized access to a fleeter's premises, and did not involve the issue of whether barges were properly inspected and tied-off in a fleet after being shifted; and there is case-law establishing a fleeter's duties in each of these circumstances. While a tug floating past a fleet on its way to another location might well observe a sinking barge, such drive-by observation cannot possibly determine whether tie-offs are tight and secure, especially at night and when the tie-offs that failed are between barges and not on the outside of the fleet where tugs would pass. Accordingly, the Midland Enterprises case applies to entirely *1060 different circumstances than those of the present case.
x. In addition, because Midland Enterprises did not involve a barge coming free from its moorings and striking other barges, the presumption of The Louisiana did not apply, as it does here. Under that presumption, the fleeter is liable unless it can prove it took all action that "could have" prevented the breakaway, a significantly more onerous burden than proving the fleeter acted reasonably. In this case, there is no doubt that an inspection of tie offs after the ING 5565 was shifted by crewmembers on the barge, as well as the numerous other measures discussed above, "could have" prevented the breakaway.

IV. Defendants Failed to Prove the ING 5565 Came Free as the Result of Vis Major.

y. To overcome the presumption of their negligence, Defendants must prove that barge ING 5565 came free due to vis major or inevitable accident, according to the principles established by the Supreme Court in The Louisiana. Otherwise it is conclusively presumed the barge came adrift due to the negligence of Defendants. "It is well-established that the affirmative defense of vis major or force of nature (formerly `Act of God') is the concept of a natural force of such inevitability and irresistibleness that man cannot cope with it, either to predict, forestall it or control it when it arrives." Woodbine Auto, Inc. v. Southeastern Pennsylvania Transp. Authority, 8 F.Supp.2d 475, 481 (E.D.Pa. 1998). The burden of proving an inevitable accident or an Act of God rests heavily upon the vessel asserting such defense. Bunge Corp. v. Freeport Marine Repair, Inc., 240 F.3d 919, 926 (11th Cir.2001) (holding that Hurricane Opal, which involved winds between 85 and 103.5 miles per hour, did not absolve defendant of liability).
z. Even when confronted by an Act of God, there must be an affirmative showing that the party responsible for a vessel that comes loose of its moorings did everything in its power to avoid the casualty. Johnson v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co., 400 F.2d 968, 972 (9th Cir.1968). This affirmative defense requires the entire exclusion of human agency from the cause of the loss or injury. Southern Pacific Co. v. Loden, 19 Ariz.App. 460, 508 P.2d 347, 351-52 (1973). A casualty cannot be considered an Act of God if it results from  or is contributed to byhuman agency, and that which may be prevented is not an Act of God or vis major. Id., 508 P.2d at 352; see also, Compania de Navigacion Porto Ronco, S.A. v. S/S American Oriole, 474 F.Supp. 22, 27 (E.D.La.1976) (finding defendant liable for allowing moored vessel to break free, despite claim of defendant that hurricane winds of 60 miles per hour constituted vis major).
aa. In this case, Defendants have presented the Court with no evidence that an Act of God caused the ING 5565 to break free and initiate the larger barge breakaway. There has been no showing that extraordinary, unforeseeable natural conditions caused the ING 5565 to be released. Specifically, there has been no showing that river stages or flows were unpredictable or unprecedented. The evidence presented is that the river was below flood stage when the breakaway occurred, and had been at about the same level for days (See Plaintiff, Exhibit # 82). In addition, even if Defendants had demonstrated that an ice storm, tornado, flood or hurricane of unprecedented magnitude had caused the barge to come free, which they did not, they failed to show that they *1061 could not have prevented the breakaway. Such a showing is a prerequisite for the vis major defense to apply and is wholly absent in this case.

V. Defendants Did Not Prove the ING 5565 Came Free as the Result of Inevitable Accident.

bb. It is well settled that the burden of proving inevitable accident is "heavily" upon the party asserting that defense. Boudoin v. J. Ray McDermott & Co., 281 F.2d 81, 88 (5th Cir.1960); The Lackawanna, 210 F. 262, 264 (2d Cir. 1913); that a finding of inevitable accident is "not to be lightly arrived at," The Bayonne, 213 F. 216, 217 (2d Cir.1914); Palmer v. City of New York, 43 F.Supp. 43 (S.D.N.Y.1942); and that the party asserting the defense must affirmatively establish that the accident could not have been prevented. Swenson, 204 F.2d at 640.
cc. "In other words, the vessel that breaks loose from her moorings has the burden of establishing inevitable accident . . . and the burden is not easily met." Martinez v. United States, 705 F.2d 658, 661 (2d Cir.1983) (finding party in custody of breakaway barge did not overcome burden by demonstrating that river currents were unusually swift); see also, Swenson v. The Argonaut, 204 F.2d 636 (3d Cir. 1953) (heavy burden not overcome by showing that vessel broke her moorings during thunderstorm involving sixty mile per hour winds); Zubik v. Zubik, 384 F.2d 267 (3d Cir.1967) ("heavy burden" not met even though unusually large ice flow traveling downriver caused barges to break loose from their moorings).
dd. Defendants have failed to carry their heavy burden of showing that this incident was unavoidable or inevitable.

VI. Defendants Failed to Prove the Superseding Criminal Act of a Third Party was the Intervening Cause of the Breakaway.

ee. The Court also rejects the attempts of the Defendants to avoid liability for their own negligence by claiming that the criminal acts of an unknown third-party constitute an intervening and superseding cause of the barge breakaway.
ff. Defendants have failed to sustain their burden of proof that a criminal act even occurred. None of the witnesses presented by the Defendants saw the supposed crime or know of anyone who committed the crime or witnessed it (Vol. IV-A, p. 55, l. 23-25; Vol. VI-A, p. 34, l. 2-7; Vol. VI-B, p. 14-19). Justin Davis, the mate on the M/V JOHN WALKER, helped shift barges in the Valley Main Fleet shortly before the breakaway. He stated:

Question: . . . At any time on the evening
 of the breakaway did
 you see any unauthorized
 persons at the Valley Main
 Fleet?
Answer: No, I did not.
Question: Did you see anybody or any
 persons board the Valley
 Main Fleet and turn loose the
 ING 5565
Answer: No, sir, I did not.

(Vol. VI-A, p. 34, l. 2-7) James Radisic, pilot of the M/V FRANCIS the evening of the breakaway, shifted barges in the Valley Main Fleet a few hours before the breakaway and was near the fleet after that. He testified:

Question: And you never saw anybody
 who is unauthorized on board
 that fleet, did you?
Answer: No.
Question: And you have no knowledge
 whatsoever of any particular
 person turning loose that
 fleet, do you?
Answer: Absolutely not.

(Vol. VI-A, p. 67, l. 4-9) James Patterson, president of Paragon, testified:

*1062
Question: Did you observe anybody
 climbing onto the barge on
 the night of the breakaway?
Answer: No, I did not.
Question: Do you know of anyone else
 who observed anyone climbing
 onto the fleet barge on
 the night of the breakaway?
Answer: No, I do not.
Question: Do you know of anyone who
 observed anyone deliberately
 releasing Barge ING 5565 on
 the night of the breakaway?
Answer: Did you say, do I know anybody
 who observed them?
Question: That's right.
Answer: No, I do not.

(Vol. VI-B, p. 18, l. 19p. 19, l. 5)
gg. No one was ever charged with or convicted of releasing the ING 5565 and a reward in the amount of $25,000 for information leading to the supposed perpetrator was never claimed (Vol. VI-B, p. 19).
hh. Any suggestion that a footprint on one of the fleet barges at the Valley Main fleet and debris (a crumpled cigarette pack and parts of a broken flashlight) is proof of sabotage is utterly unconvincing. Because people worked on the fleet barges, one would expect to find such trash and a footprint there. There was no evidence in any way linking the footprint or the debris to any individual, let alone a person who released the ING 5565. Further, the single footprint found on one of the fleet barges was nowhere near the location at the Valley Fleet where ING 5565 had been moored. Plaintiff's Exhibit # 107 is a depiction of the barges in the Valley Main Fleet prior to the breakaway. The footprint was found next to the ladder from fleet barge MV 826 to the river bank. The ING 5565 was moored four barges away from the MV 286, and no evidence was presented of footprints at or near the starboard side of the ING 5561, to which the ING 5565 had been moored.
ii. Admiralty law recognizes the liability of a fleeter or bailee for failing to provide adequate security at its facility. In Snyder v. Four Winds Sailboat Centre, Ltd., 701 F.2d 251 (2d Cir.1983), the plaintiff had moored his sailboat at the Four Winds marina. The boat was subsequently stolen. As in the case at bar, the marina failed to provide adequate security for its premises and vessels in its custody. The marina did not place fences around its floating docks, nor did it fence the property from the street. Id. It did not maintain dock guards, alarms or install other security devices. Id. The Four Winds court determined, "[t]he total absence of security or deterrent measures other than the dock lighting was an open invitation to predators . . ." Id. The court held that, as a bailee, "its duty of ordinary and reasonable care requires that it take some measures, such as private security service, to protect the boat it stores." Id. at 253. The court held the marina should have taken additional security precautions to protect vessels in its custody and was liable for its failure to do so. Id. at 253.
jj. The Snyder case is fatal to Defendants' claim that if some third-party set free the ING 5565 barge, Defendants are exonerated. As in that case, the security in place at Defendants' facilities was nonexistent. This was true before the strike and it was true on the night of the breakaway, when Defendants employees were on strike.
kk. Defendants owed a duty to provide adequate security that would prevent third-party vandalism or crimes, especially in light of the labor situation. Hiring security guards, removing the ladder that provided access to the fleet barge, and pulling the fleet barge off the bank are all measures the Defendants should have undertaken before the breakaway to protect properly in their custody.
ll. The superseding and intervening cause theory is also inapplicable for a more fundamental reason. "The criminal or negligent acts of a third party do not *1063 break the causal link between the defendant's conduct and the alleged injuries, if the defendant's conduct created or increased the risk of such acts." Vickers v. U.S., 228 F.3d 944, 956 (9th Cir.2000). "If the danger of an intervening negligent or criminal act should have reasonably been anticipated and protected against, the defendant will be held responsible despite the entry of another act in the chain of causation." Marsh v. Barry, 824 F.2d 1139, 1143 (D.C.Cir.1987); Spence v. U.S., 132 F.Supp.2d 1061, 1076 (M.D.Ga.2001). "It is not necessary that a defendant should have been able to anticipate the particular consequences which ensued . . . instead, all that is required for liability to attach is that the defendant, exercising ordinary prudence, might have foreseen that some injury would result from his act or omission, and that consequences of a generally injurious nature might result." Spence, 132 F.Supp.2d at 1076.
mm. The fact that some criminal mischief might occur on the Paragon premises while not necessarily the precise criminal act which purportedly triggered the breakawaywas foreseeable and should have been addressed by Defendants. Accordingly, the doctrine of superseding and intervening cause is inapplicable.

VII. Defendants Are Not Entitled to Limit Their Liability Pursuant to 46 U.S.C. APP. § 183 (West 2000).

nn. Under the Limitation of Liability Act, a ship owner is entitled to exoneration if "he, his vessel, and crew are found to be completely free of fault." Muer v. Karbel, 146 F.3d 410, 414 (6th Cir.1998). A negligent vessel owner may limit his liability only if the casualty occurred without the "privity or knowledge" of managing agents (land-based managers) or the vessel owner. Id.; 46 U.S.C.App. § 183 (West 2000).
oo. "It is well settled that limitation of liability is an affirmative defense . . ." Terracciano v. McAlinden Constr. Co., 485 F.2d 304, 307 (2d Cir. 1973). Defendants bear the burden of proving that their officers and managing agents lacked the requisite privity or knowledge. Id. A limitation action requires the district court to make a two-step inquiry: (1) negligence or unseaworthiness, and (2) the owner's privity or knowledge of the negligence. Id.; In re Cleveland Tankers, Inc., 67 F.3d 1200, 1203 (6th Cir.1995). The burden of proving negligence lies on the person claiming to be injured, but once negligence is established, the vessel owner must prove lack of knowledge or privity to the negligence. Muer, 146 F.3d at 414; S & E Shipping Corp. v. Chesapeake & Ohio Ry. Co., 678 F.2d 636, 642 (6th Cir.1982). "To sustain its burden of proof a defendant must show how the loss occurred, together with its lack of privity to or knowledge of the asserted cause. If it cannot show how the loss occurred, a defendant must exhaust all the possibilities, and show that as to each it was without the requisite privity or knowledge." Terracciano, 485 F.2d at 307.
pp. "Privity or knowledge" refers to the managing agent's personal participation in, or actual knowledge of, the specific acts of negligence or conditions of unseaworthiness which caused, or contributed to, the casualty. A high burden of diligence to detect and correct fault is placed on an owner: "[t]he measure in such cases is not what the owner knows, but what he is charged with finding out." In re Sause Bros. Ocean Towing, 769 F.Supp. 1147, 1151 (D.Or.1991). As the Seventh Circuit explained:
The recent judicial trend has been to enlarge the scope of activities within the "privity or knowledge" of the shipowner, including to corporations knowledge or *1064 privity of lower level employees . . .; requiring shipowners to exercise an ever-increasing degree of supervision and inspection . . .; imposing a heavy burden on shipowners to prove their lack of privity or knowledge; rendering the shipowner's duty to ensure the seaworthiness of the ship nondelegable; and narrowing the group of potential defendants eligible for exoneration under the Act . . .
Amoco Cadiz Limitation Process, 954 F.2d 1279 (7th Cir.1992).
qq. The Sause Bros. opinion involves circumstances similar to the present case. In that case, a vessel owner, SBOT, sought to limit its liability for a collision which caused the release of 230,000 gallons of oil into the navigable waters of the United States. 769 F.Supp. at 1149. The negligent act which allegedly caused the casualty was the failure on the part of SBOT to inspect and maintain wires holding a tow in place. Id. After the trial court entered a finding of liability, the court next addressed the issue of whether the negligence was within the privity and knowledge of the SBOT. Id. at 1150. The court found that SBOT knew the methods by which its crew "inspected and maintained the tow wire." Id. at 1155. The court further found that the training and knowledge of the crew was lacking and that this failure was another issue within the privity and knowledge of SBOT. Id. at 1147. As such, the court found that SBOT was not entitled to limit its liability.
rr. For the same reasons, limitation of liability is unavailable to Defendants, as they have failed to satisfy their burden that the cause of the casualty was not within the privity and knowledge of their managing agents. As stated above, Defendants have produced no direct evidence of how the breakaway occurred. In order to obtain the protections of the Limitation of Liability Act, they must therefore address each possible cause of the breakaway and then demonstrate for each possible cause that the act of negligence of Defendants' employees was not within the privity and knowledge of their managing agents. This they have failed to do; to the contrary, it was the acts and omissions of Defendants' managing agents which led to this casualty. Defendants' supervisors maintained no policies regarding the tying off and inspection of barges in their custody. Had crewmembers of Defendants been properly supervised by managers of Defendant, they would have been required to properly inspect tie-offs after barges in fleets were shifted. In addition, pilot James Radisic was involved in the shifting of barges in the Valley Main fleet a few hours before the breakaway (Vol. IV-A, pp. 62-63). He testified at trial that he was one of the owners of the Defendants tugs (Vol. VI-A, p. 62, l. 21p. 63, l. 4). Accordingly, a vessel owner was present when barges in the Valley Main fleet were shifted shortly before the breakaway, which breaks limitation for any negligence involved in shifting and inspecting tie-offs at the Valley Main fleet.
ss. With regard to security issues, limitation is also unavailable. The president of Paragon, Mr. James Patterson, and the fleet manager, Mr. Karl Berthelot, did not take a single step towards providing security at their fleets, and both are managing agents of Defendants. Thus, all decisions regarding security were within the privity and knowledge of Defendants' managing agents, and Defendants have failed to carry their burden on the limitation issue.[16]

*1065 VIII. Defendants Failed to Prove That the Fault of the Plaintiff Caused or Contributed to the Barge Breakaway.

46. Federal courts sitting in admiralty apply comparative fault principles. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 408-09, 74 S.Ct. 202, 98 L.Ed. 143 (1953). In order to mitigate an award of damages due to the purported negligence of the plaintiff, a defendant bears the burden of proof. Borough v. Duluth, Missabe & Iron Range Ry. Co., 762 F.2d 66, 69 (8th Cir.1985).
47. Defendants failed to satisfy their burden of proving that negligence on the part of ARTCO caused or contributed to the breakaway. Overwhelming evidence establishes that the barges in each of the ARTCO fleets were properly secured and would not have come loose had they not been struck by the runaway barge ING 5565 (Vol. II, p. 81; Vol. VI-A, pp. 34-36; Vol. III-A, pp. 56-57). The uncontested testimony of engineer Paul Weis established that the force of the impact caused by the ING 5565 barge was more than 40 times the holding capacity of properly secured mooring wires used to tie off the ARTCO barges (Vol. VI-A, pp. 23-45). Defendants made no allegation that any actions on the part of the Plaintiff's employees after the breakaway began contributed to the magnitude of the casualty. As with the other defenses submitted by the Defendants, no credible evidence has been submitted that ARTCO did anything wrong to cause the breakaway. As such, comparative fault does not apply.

IX. Plaintiff is Entitled to be Made Whole Under the Admiralty Doctrine of Restitutio in Integrum, Including an Award or Pre-Judgment Interest.

48. In admiralty, damages are awarded in accordance with the principal of restitutio in integrum. Courts award admiralty damages to make injured parties whole. Phillips Petroleum Co. v. Stokes Oil Co., 863 F.2d 1250, 1257 (6th Cir.1988). Property owners are to be compensated fully for all losses incurred, in a manner which will restore them to the condition which would have existed had the casualty not occurred. Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 155-56, 45 S.Ct. 465, 69 L.Ed. 890 (1925); Zanzibar Shipping, S.A. v. Railroad Locomotive Engine No. 2199, 533 F.Supp. 392, 394 (S.D.Tex.1982).
49. "It is elementary that a wrongdoer in a collision is liable for the damages to the vessel as they exist at the moment of their creation." Shipowners & Merchants Tugboat Co. v. U.S., 205 F.2d 352, 352 (9th Cir.1953). When a vessel is lost or damaged, "the owner is entitled to its money equivalent, and thereby to put him in as good a position pecuniarily as if his property had not been destroyed." King Fisher Marine Service, Inc. v. NP Sunbonnet, 724 F.2d 1181, 1185 (5th Cir.1984) (quoting Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 155, 45 S.Ct. 465, 69 L.Ed. 890 (1925)).
50. Where the injured vessel is not a total loss, reasonable repair cost is the measure of damages. Missouri Portland Cement Co. v. Walker Barge Fleeting Service, Inc., 561 F.Supp. 12, 15-16 (W.D.Ky.1982); Tug June S v. Bordagain *1066 Shipping Co., 418 F.2d 306, 307 (5th Cir. 1969). "[I]t is well-settled that damages of less than a total loss in admiralty are compensable solely by reference to the costs of repairs." Bunge Corp. v. American Commercial Barge Line Co., 630 F.2d 1236, 1241 (7th Cir.1980) (citing The Baltimore, 8 Wall. 377, 75 U.S. 377, 386, 19 L.Ed. 463 (1869); Oregon v. Tug Go-Getter, 468 F.2d 1270, 1273 (9th Cir.1972); Zeller Marine Corp. v. Nessa Corp., 166 F.2d 32, 33-34 (2d Cir.1948)); see generally, G. GILMORE & C. BLACK, THE LAW OF ADMIRALTY § 7-17 (2d ed.1975). An injured vessel owner is entitled to be placed in the same position he occupied before the collision. Id.
51. The parties stipulated prior to trial that damages incurred by ARTCO as the result of the barge breakaway amounted to $1,544,713, and an itemization of the damages is attached to this stipulation (Joint Stipulation of Facts). This amount represents costs associated with repairs to the barges, cargo loss, salvage, shifting and surveying. The Court therefore awards actual damages in the amount of $1,544,713 to Plaintiff and against Defendants, jointly and severally.
52. An award of prejudgment interest "is well-nigh automatic in suits in the admiralty." Masters v. Transworld Drilling Co., 688 F.2d 1013, 1014 (5th Cir. 1982). Prejudgment interest should be awarded in admiralty cases, absent extraordinary circumstances, in order to compensate the injured party for the loss of the use of money to which it was entitled when its right to a remedy accrued. City of Milwaukee v. Cement Division, National Gypsum Co., 515 U.S. 189, 196, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995); Ingersoll Milling Mach. Co. v. M/V Bodena, 829 F.2d 293, 305 (2d Cir.1987); McCrann v. United States Lines, Inc., 803 F.2d 771, 773-74 (2d Cir.1986); Independent Bulk Trans., Inc. v. MORANIA ABACO, 676 F.2d 23, 26 (2d Cir.1982). Such an approach ensures the injured party is compensated in full. Bunge Corp., 630 F.2d at 1242. In fact, it is "generally considered an abuse of discretion for a court to deny interest . . . without articulating any reason for its action." Id.
53. A good faith dispute to liability and/or the existence of mutual fault do not constitute "extraordinary circumstances" in determining whether or not an award of prejudgment interest is warranted. City of Milwaukee, 515 U.S. at 197, 115 S.Ct. 2091. "Pre-judgment interest is awarded customarily from the date of the casualty in admiralty law." National Shipping Co. v. United States, 95 F.Supp.2d 482, 496 (E.D.Va.2000); see also, Probo II London v. Isla Santay MV, 92 F.3d 361, 366 (1996); Independent Bulk Trans., 676 F.2d at 25. Pre-judgment interest is compounded annually. Federal Barge Lines, Inc. v. Granite City Steel, 664 F.Supp. 453, 454 (E.D.Mo.1987). The rate of interest should be fixed at a rate in keeping with prevailing interest rates. General Facilities, Inc. v. National Marine Service, Inc., 664 F.2d 672 (8th Cir. 1981) (per curiam); Sabine Towing & Transportation Co. v. Zapata Ugland Drilling, Inc., 553 F.2d 489, 490-91 (5th Cir.1977).
54. Evidence presented of interest rates from the St. Louis Federal Reserve Bank establishes that 8.52 percent per annum is a reasonable pre-judgment interest rate from April 24, 1998 to the present (Plaintiff's Exhibit # 112). This number is established by averaging the monthly prime lending rates published by the Federal Reserve from the date of the accident to the time of the trial. There was no evidence of any alternative interest rate. In General Facilities, Inc. v. National Marine Service, Inc., 664 F.2d 672 (8th Cir.1981), the Eighth Circuit upheld *1067 an award of prejudgment interest based on evidence of the prime interest rate during the period in question. In that case the interest rate adopted and upheld was 15.75% per annum. There is no requirement in admiralty cases that an economist testify on the rate of prejudgment interest.
55. No extraordinary circumstances justify the refusal of prejudgment interest in this case. Accordingly, the Court awards pre-judgment interest at a rate of 8.52 percent per annum, compounded annually, from the date of the casualty April 24, 1998until the date of the judgment. Post-judgement interest is awarded to Plaintiff, as provided in 28 U.S.C.A. § 1961 (West 2000).

X. Conclusion

Based on the foregoing, the Court concludes that judgment should be entered in this action in favor of plaintiff and against defendants.
An appropriate judgment will accompany these findings of fact and conclusions of law.

AMENDED JUDGMENT
This admiralty action came on for trial before the undersigned United States District Judge on plaintiff's claims pursuant to 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure. In accordance with the Findings of Fact, Conclusions of Law and Order of April 30, 2002, and incorporated herein,
IT IS HEREBY ORDERED, ADJUDGED and DECREED that judgment is entered in favor of plaintiff American River Transportation Company, Incorporated and against defendants Paragon Marine Services, Incorporated and Consolidated Grain and Barge Company.
IT IS FURTHER ORDERED, ADJUDGED and DECREED that plaintiff is awarded damages in the amount of One Million Five Hundred Forty-Four Thousand Seven Hundred and Thirteen Dollars ($1,544,713.00), together with pre-judgment interest at the rate of 8.52 percent per annum from April 24, 1998, until date of judgment herein, April 30, 2002.
IT IS FURTHER ORDERED ADJUDGED AND DECREED that costs are assessed against defendants Paragon Marine Services, Incorporated and Consolidated Grain and Barge Company, jointly and severally.
NOTES
[1] ARTCO fleets are secured to the river bank with an anchor chain and/or with two-inch shore wires (Vol. II  p. 15, l. 22 to p. 16, l. 2). Fleet barges are barges that are permanently tied off to the anchor chains or shore wires (Vol. II  p. 16, l. 15-19). Barges which are placed in a particular fleet are secured to the fleet barges at the "main tie off" (Vol. II  p. 17, l. 1-7). The "main tie off" consists of a dead eye wire, three downriver one-inch wires, a three-part upriver wire and a breast wire (Vol. II  p. 17, l. 5-7). The barges at the head of ARTCO fleets are tied-off with a three-part downriver wire and a three-part upriver wire (Vol. II  p. 18, l. 1-5). These wires are one-inch steel cables approximately forty-five or fifty feet long which are attached to winches located on the four corners of each barge (Vol. II  p. 18, l. 6-8). A winch is used to secure the wires between the barges after the wires have been placed around deck fittings by the deckhands (Vol. II  p. 18, l. 25 to p. 20, l. 8).
[2] One river barge holds the equivalent of fifteen railroad cars of cargo (Vol. IIIB  p. 41, l. 20-24).
[3] It should be noted that drift had accumulated at the head of the Valley Main fleet prior to this shifting maneuver; drift consists of trees and debris that travels down river and which Defendants had allowed to accumulate at the head of the Valley Main fleet (Vol. IV-A, p. 46, l. 1-9). Plaintiff's Exhibit 102A depicts the degree of drift which Defendants had allowed to gather at the head of the fleet.
[4] The crew of the BILL PEHLER inspected other ARTCO fleets on the night of the breakaway and those fleets were also properly secured (Vol. II  p. 83, l. 1-4).
[5] It should be noted that ARTCO had never experienced problems with barges coming out of its fleets at that river stage when moored in the manner they were moored on the evening of April 24, 1998 (Vol. IVB  p. 24, l. 8-11).
[6] Mr. Weis estimated the current speed at 7 miles per hour for purposes of his calculations, and determined the impact force was 2030 tons (Vol. V-A, p. 34, l. 22-25 and p. 35, l. 18). Even if half that current speed were used, the impact force of the ING 5565 exceeded the holding strength of the mooring wires by 25 times (Vol. V-A, p. 35, l. 1-6).
[7] Ingram barges were identified by the letters "ING," followed by a number (Vol. II, p. 93, l. 20  p. 94, l. 2).
[8] Kevels, buttons and timberheads are deck fittings used to wrap lines or wires around them and thus attach barge (Vol. III-A, p. 10, l. 12-14). A kevel is an anvil shaped fitting (Vol. III-A, p. 10, l. 2-4). A button is a round, flat deck fitting (Vol. III-A, p. 10, l. 7-11). Face wires are wires at the head of tug boats used to secure the boat to a barge (Vol. III-A, p. 9, l. 7-21).
[9] The twelve barges caught by the ANDREA LEIGH were the ART 381, XL 720, XL 355, CC 95130, SG 556, CC 95143, CC 8836, CC 8260, JB 29, XL 746, JB 51 and the AT 312 (Vol. III-A, p. 97, l. 1-5) (Plaintiff's Exhibit # 33). These barges were located in the Lesperance Street fleet immediately prior to the breakaway (Vol. III-A, p. 98, l. 4-9) (Plaintiff's Exhibit 26).
[10] Interestingly, Defendants were not the first to know that a barge from their fleet had been involved in the breakaway (Vol. IV-A, p. 17, l. 2-5). The morning after the breakaway, a Paragon dispatcher was notified by marine radio that the ING 5565 had been found in a Riverway Harbor fleet (Vol. IV-A, p. 17, l. 6-11).
[11] Freeboard is the distance from water level to deck level of a vessel.
[12] Prior to trial, the parties stipulated that costs of $1,544,713 were incurred by Plaintiff, were fair and reasonable, and were attributable to the breakaway (Joint Stipulation of Facts, Paragraph 15; Vol. II, p. 5, l. 24 to p. 6, l. 4).
[13] While no witness observed the ING 5565 come out of the Valley Main fleet, it is likely that the wires connecting the ING 5565 to the ING 5561 came loose during the shifting of those barges a few hours before the breakaway, and the mooring wires subsequently broke due to the action of the waves, wind and a strong current, and perhaps drift (floating logs in the river), on the Valley Main fleet.
[14] Two of Paragon's fleets in the area were more than 11 barges wide on the morning after the breakaway (Vol. III-B, p. 57, l. 12 to p. 58, l. 5). These fleets were wider than ARTCO's Lesperance Street fleet at the time of the breakaway (Vol. III-B, p. 58, l. 6-9).
[15] Defendants argue that the legal presumption of negligence does not apply in this case, citing Erlbacher v. Republic Homes Corp., 263 F.2d 217 (8th Cir.1959) and Alpine Forwarding Co. v. Pennsylvania R. Co., 60 F.2d 734 (2d Cir.1932). The Erlbacher case involved a mutually beneficial bailment, as opposed to a bailment for hire, as in the case at bar. 263 F.2d at 219. More importantly, the Eighth Circuit upheld the decision of the trial court in that case to invoke the presumption of negligence against the defendant, which had allowed a yacht in its care, custody and control to be destroyed by fire. Id. By showing that damage had resulted after delivery of the yacht to the defendant, the trial court shifted to the defendant the burden of proving an absence of negligence on its part. Id. "The burden of proof of negligence is on the bailor, but by proving that the vessel was delivered to the bailee in good condition and damaged while in his possession, the bailor makes out a prima facie case of negligence; and the duty then devolves upon the bailee to go forward with the evidence and show affirmatively that he exercised ordinary care." Id. at 221. Similarly, in Alpine Forwarding, the Second Circuit upheld the finding of the trial court that the bailor defendant had failed to overcome the presumption of negligence which arose under similar circumstances. 60 F.2d at 736. Simply stated, these cases do not stand for the propositions advanced by Defendants in their pretrial filings and have no applicability to the resolution of this matter.
[16] Limitation should be refused for one additional reason. Despite repeated attempts to obtain information relating to the breakaway throughout the course of discovery, Defendants failed to provide any information regarding this defense prior to trial. Plaintiff's Interrogatory # 17 requested information supporting the contention that the loss occurred without the privity and knowledge of owners of the JOHN WALKER and the MV FRANCIS and this information was never furnished. As a sanction for failure to provide such information and supplement previous answers, this affirmative defense should be stricken.